**E-FILED**
Monday, 28 September, 2015  10:44:46 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| JON RICHARD MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.   14-cv-1248 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

Pending before the Court in this social security disability benefits matter are Plaintiff's Motion for Summary Judgment (Doc. 11) and Defendant's Motion for Summary Affirmance (Doc. 14). The motions have been fully briefed and are ready for ruling. For the reasons stated below, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Affirmance is GRANTED.

### BACKGROUND[1]

## I.   *Procedural History*

On September 19, 2011, Plaintiff applied for disability insurance benefits under Title II of the Social Security Act, claiming that he became disabled as of January 17, 2008, due to a right torn labrum, left torn labrum, right shoulder injury

---

[1] While this Court reviews the entire administrative record, it focuses its analysis and discussion on the issues and evidence raised by the parties. Plaintiff must "cite to the record by page number the factual evidence which supports the plaintiff's position." CDIL-LR 8.1(D). Thus, the Court will not scour the record for additional evidence that might support Plaintiff's claims. Furthermore, since Plaintiff is represented by counsel, the failure to cite particular pieces of evidence in the record will be deemed a waiver of his reliance on that evidence.

cartilage damage, left shoulder injury, bone spurs neck and depression. (R. at 159).[2]
His claim was initially denied on December 6, 2011. (R. at 75). Plaintiff filed for
reconsideration on December 12, 2011 (R. at 81) and was again denied on March 1,
2012. (R. at 82). On March 6, 2012, Plaintiff filed a written request for a hearing,
which was held on January 2, 2013. (R. at 35). On January 25, 2013, the
Administrative Law Judge ("ALJ") issued an opinion finding that Plaintiff was not
disabled and thus not eligible for disability insurance benefits. (R. at 24). On
February 12, 2013, Plaintiff filed a request for review of the ALJ's decision (R. at 2),
which was ultimately denied on May 12, 2014. (R. at 1). This final denial made the
ALJ's decision the final decision of the Commissioner of Social Security. (R. at 1).
Plaintiff then filed his Complaint (Doc. 1) with this Court on June 20, 2014.

## II.   *Relevant Medical History*

In his application for disability benefits, Plaintiff explained that his need for
disability benefits arose from a right torn labrum, left torn labrum, right shoulder
injury cartilage damage, left shoulder injury, bone spurs neck and depression. (R. at
159). In February of 2007, Plaintiff injured his right shoulder in an automobile
collision. (R. at 357). He presented himself to Dr. Joseph Newcomer, M.D. in
October of 2007 where the Plaintiff informed him that he was experiencing a lot of
difficulty and pain in the anterior aspect of his shoulder; that his shoulder hurt
pretty much with any activity that he did, not necessarily chest level or higher; that
he had to give up coaching basketball; and that while he continued his work as an

---

[2] Citation to R. at ___ refers to the page in the certified transcript of the entire
record of proceedings provided by the Social Security Administration.

electrician, he did so while fighting through the pain. (R. at 357). Earlier in 2007 he had a Cortisone shot which helped for about two days and he had three months of physical therapy which provided him some relief. (R. at 357). He was not on any medications at the time of his initial visit to Dr. Newcomer and he stated he was not experiencing any numbness or tingling into the fingertips. (R. at 357).

A month later, Dr. Newcomer went over the results of an MRI with Plaintiff that revealed his right shoulder had a tear of the anterior inferior labrum, associated with a paralabral cyst and a possible tear of the posterior labrum, along with other nonspecific inflammation of the acromioclavicular joint. (R. at 356-57). Osteonecrosis and bone bruising were mentioned as possibilities. (R. at 377). In January of 2008, Plaintiff underwent an arthroscopic debridement of labral tear and micro fracture chondroplasty of the chondral defect and bursectomy. (R. at 389). He left the hospital with an ice pack to right shoulder and Percocet five mg for pain. Plaintiff stopped working. (R. at 159, 389-90).

Plaintiff suffered through significant symptoms of adhesive capsulitis (frozen shoulder), discomfort and lack of flexibility after the surgery, and underwent a second procedure on his right shoulder on April 17, 2008. (R. at 388). This procedure consisted of an interscalene block injection and manipulation of the shoulder while Plaintiff was under anesthesia. (R. at 388). He also engaged in extensive physical therapy and Dr. Newcomer noted that after the procedure, Plaintiff achieved full forward flexion, full abduction, and internal external rotation at 90 degrees. (R. at

388). Plaintiff tolerated the procedure well and was discharged in stable condition. (R. at 388).

Plaintiff showed improvement with each right-shoulder examination, and by November 24, 2008, he had excellent forward flexion abduction that constituted a functional arc of motion, making him functional in his right shoulder. (R. at 353). However, Dr. Newcomer observed an intraarticular derangement in his left shoulder, and recommended arthroscopy. (R. at 353). In September of 2008, Plaintiff had undergone an MRI of the left shoulder that revealed a suspected chronic Bankart lesion anterior-inferior labrum with associated paralabral cyst. (R. at 376).

In February of 2009, Plaintiff complained of steady pain to Dr. Newcomer, who attributed such to the portals and possible myositis from the right shoulder surgery. (R. at 352). In April of 2009, Plaintiff continued to complain of constant pain and Dr. Newcomer put him on a work restriction that limited his use of either arm to chest level or higher, which the Court interprets as not using the arms higher than the chest given his past complaints of pain resulting from using his arms in an overhead fashion. (R. at 352). By June of 2009, Plaintiff was able to lift twenty pounds overhead and his range of motion was progressing nicely although he still complained of his left shoulder bothering him. (R. at 352). Dr. Newcomer notes that Plaintiff was "not quite ready for taking the step of having arthroscopic surgery for the left surgery" (R. at 352). In August of 2009, Plaintiff reports to Dr. Newcomer that he had been pushing the envelope and still suffering pain in his left

shoulder. (R. at 351). In October of the same year, Dr. Newcomer documents a visit from Plaintiff and notes that surgery on the left shoulder is elective. (R. at 351).

On October 23, 2009, Plaintiff finally underwent left arthroscopic surgery to repair a partial rotator cuff tear, along with labral repair and subacromial decompression. (R. at 386). He tolerated the procedure well, and was released in a sling. Afterwards, Plaintiff underwent intensive physical therapy for the next several months. (R. at 386). By December 28, 2009, Dr. Newcomer noted that Plaintiff exhibited a lot of guarding of his shoulder and called for a functional capacity evaluation ("FCE"). (R. at 351). Thereafter, Plaintiff underwent the FCE. Dr. Newcomer later reviewed the FCE and noted that the Plaintiff's failure in 9 out of 13 functional very concerning for symptom magnification. (R. at 351).

In April of 2010, Plaintiff underwent another FCE to test his strength and range of motion. The evaluators noted that the majority of his functional activities were limited by subjective reports of pain and his Plaintiff's grip strength inconsistencies casted doubt on his effort. (R. at 421). At the end of the day, they concluded the Plaintiff had demonstrated the ability to perform at the Light-Medium level functioning (lifting thirty-five pounds infrequently, twenty pounds frequently and walking at three mph while carrying no load or slower while carrying twenty pounds) to Medium level of functioning (lifting fifty pounds maximum and lifting/carrying up to twenty-five pounds frequently), which was definitely less than the Very Heavy level of functioning required of his last job as an electrician. (R. at 421).

On May 10, 2010, Dr. Newcomer released Plaintiff to work with permanent restrictions to light-medium to medium level of function, with no lifting over fifty pounds maximum, no lifting over ten pounds chest level or higher, and infrequent carrying of up to thirty-five pounds. (R. at 350).

On November 7, 2011, Plaintiff underwent a consultative physical examination with Sarat Yalamanchili, M.D., and complained of bilateral shoulder pain and limitation, as well as neck pain. (R. at 290). Dr. Yalamanchili noted that Plaintiff had some, but not much, loss of flexion, extension and abduction in both shoulders, with slightly more on the right than left. (R. at 293-94). Dr. Yalamanchili further observed Plaintiff to have normal strength (5/5) in his upper extremities; no muscular atrophy; normal ability to perform fine and gross manipulation; no difficulties in getting on/off the examination table, tandem walking, toe walking, heel walking, squatting or one-leg hopping; and no need for an assistive device. (R. at 293-94). Dr. Yalamanchili observed Plaintiff to have right shoulder pain more than left shoulder and an inability to lift heavy weights, and he diagnosed bilateral shoulder pain. (R. at 295).

On November 29, 2011, state agency physician Henry Rohs, M.D., completed a physical residual functional capacity (RFC) assessment form. (R. at 304). Dr. Rohs found that Plaintiff could occasionally lift/carry fifty pounds and frequently lift/carry twenty-five pounds; could stand/walk and sit about six hours in an eight hour workday; could push/pull to an unlimited degree; could occasionally climb

ladders, ropes and scaffolds; had limited reaching in all directions; and had no other restrictions. (R. at 305-08).

On February 27, 2012, state agency physician Young-Ja Kim modified Dr. Rohs' findings by finding that Plaintiff could not lift over fifty pounds, could infrequently carry up to thirty-five pounds, and could not lift more than ten pounds chest level or higher. (R. at 349).

In May of 2012, Plaintiff went to the emergency room with complaints of head pain after another car accident. (R. at 397-98). One month later, Plaintiff reported headaches and neck pain to his family doctor, Patel Mukesh, M.D. (R. at 449). Upon examination, Plaintiff had paraspinal muscle tenderness at C5, C6 and C7 but no cervical spine tenderness. (R. at 450). Dr. Mukesh suspected whiplash, and recommended ibuprofen and hot packs or biofreeze. (R. at 451).

On December 14, 2012, Plaintiff's licensed physical therapist, Jeff Schade, wrote a summary of Plaintiff's medical history. (R. at 473). Mr. Schade reported that Plaintiff's body type seemed to have an increased incidence of capsular and muscular adhesions, causing significant increases in pain and decreases in mobility. (R. at 473). Mr. Schade further indicated that Plaintiff would have continuing deficits going forward, requiring increased physical therapy, a permanent decrease in range of motion, and a potential future need for shoulder replacements. (R. at 473).

In terms of his mental history, On August 30, 2010, Plaintiff sought help for depression from his family doctor, John Purnell, M.D. Plaintiff informed Dr. Purnell

that he had been prescribed Buspar but wanted to go back on Prozac. (R. at 289). On November 30, 2010, after weaning him off Buspar, Dr. Purnell prescribed Prozac. (R. at 289). On November 9, 2011, Plaintiff appeared at a consultative psychological examination with psychologist Dr. Alvin House. (R. at 299). Plaintiff was noted as well-oriented, displaying normal general knowledge, normal written and calculation ability, and normal spontaneous verbal fluency and oral comprehension. (R. at 299). He did not exhibit any confusion or looseness of associations, but his mood was anxious. (R. at 299). Plaintiff told Dr. House that his 2007 shoulder injuries were work-related. (R. at 300), and he later received a $180,000 worker's compensation award for them, although he had told Dr. Newcomer that his shoulder injuries resulted from a February 2007 car accident. (R. at 357).

Plaintiff completed a Beck Depression Inventory (BDI) and obtained a raw score of twenty-four, suggesting moderate clinical depression. (R. at 300). When asked about his mood, Plaintiff stated that he was generally irritable and pessimistic. (R. at 300). Plaintiff told Dr. House that he felt depressed every day for the past two weeks and had negative self-thoughts, that he was not sure if his Prozac prescription was helping. He also stated he did not sleep well because of his physical impairments. (R. at 300). Plaintiff reported dyslexia and struggles in school, and struggles with wiring diagrams in his past work. (R. at 300-01) Dr. House diagnosed Plaintiff with major depressive disorder/single episode/moderate

and learning disorder, and assessed a Global Assessment of Functioning (GAF) score of 48. (R. at 301).

On December 5, 2011, state agency physician Larry Kravitz, Psy. D, completed a Psychiatric Review Technique Assessment (PRT). (R. at 312). Dr. Kravitz found that Plaintiff was only mildly limited in conducting activities of daily living and maintaining social functioning, but he had moderate restrictions in maintaining concentration, persistence and pace, with no episodes of extended decompensation. (R. at 322). Dr. Kravitz then found that Plaintiff was able to understand, remember and carry out simple and some detailed instructions, but would have difficulty sustaining performance on any more than simple, repetitive tasks secondary to limited sustainability, and that he would be capable of managing customary workplace interactions and ordinary levels of work stress with limited changes in the day-to-day work routine. (R. at 328).

On February 22, 2012, Dr. Patel noted in his treatment notes that Plaintiff's "depression and anxiety [was] stable" on his current medication. (R. at 340). On February 23, 2012, state agency psychologist Michael Schneider, Ph.D., reviewed and affirmed Dr. Kravitz's findings. (R. at 349).

## III.   *The Evidentiary Hearing*

On January 2, 2013, Plaintiff appeared with representation before the ALJ. (R. at 35). He testified that he lived with his wife and two sons, and was able to drive his sons to and from school despite that vibrations caused his symptoms to flare. (R. at 39-40). Plaintiff graduated high school but did not complete college. (R.

at 40-41). Plaintiff last worked as an electrician in 2008, and obtained an approximately $180,000 worker's compensation settlement afterward. (R. at 41-42). Plaintiff reported suffering a work accident, which later required surgery in both shoulders. (R. at 42-43). Plaintiff was taking oxycodone and meloxicam for pain and arthritis, and Lisinopril for hypertension, as well as an antidepressant. (R. at 44-45, 48). Plaintiff reported overcompensating with his left arm, and that vibrations—including vibrations from driving—aggravated his right shoulder. (R. at 45). Plaintiff indicated he might need a shoulder replacement in the future, and had recurring neck pain. (R. at 47). Plaintiff said he did not have any problems with depression before his injuries, and his pain interfered with his sleep. (R. at 49).

Plaintiff also reported problems with concentration, in part because of his pain. (R. at 50). Plaintiff reported some problems with standing and walking, and disagreed with the functional capacity evaluation that stated he could lift up to 50 pounds and frequently carry thirty-five pounds. (R. at 51-52). Plaintiff stated that vacuuming was painful for him, and he needed help shopping. (R. at 53). Plaintiff said he recently needed treatment for a groin injury after packing boxes while moving. (R. at 55). Plaintiff said he napped during the day, and reported problems with bathing and using computers. (R. at 53-54, 56). Plaintiff also reported five headaches a week. (R. at 60). Plaintiff said he could walk a mile and stand for an hour without needing a rest, but was unsure how much he could lift because he had not "tried to lift anything". (R. at 61-62). Plaintiff was continuing with weekly physical therapy. (R. at 62).

Vocational expert Randall Harding testified that Plaintiff previously worked as an electrician, which was skilled medium-exertion work. (R. at 64). The ALJ asked a hypothetical about an individual with Plaintiff's age, education and work experience, who was limited to medium work and occasional climbing of ladders, ropes or scaffolds; limited to occasional overhead reaching and frequent reaching in all other directions; moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended period, and complete a normal workday without interruptions from psychologically-based symptoms; and further limited to performing simple, repetitive tasks with no more than ordinary and routine changes in a work setting or duties. (R. at 65). The vocational expert testified that such an individual could not perform Plaintiff's past electrician work, but could perform unskilled medium work positions in the economy. (R. at 65-66).

The ALJ then modified the hypothetical to further limit the individual to lifting no more than 35 pounds occasionally and 10 pounds frequently, and no more than 10 pounds chest level or higher, infrequent carrying of up to 35 pounds, and no concentrated exposure to vibration or temperature extremes. (R. at 66). The vocational expert testified that such an individual could perform laundry worker, electrical assembly and usher/lobby attendant jobs. (R. at 66-67).

## IV.   *The ALJ's Opinion*

The ALJ issued his decision to deny Plaintiff's disability claims on January 25, 2013. (R. at 24). He concluded that Plaintiff met the insured status

requirements through June 30, 2013; that he had not engaged in substantial gainful activity since January 17, 2008; and that he suffered from multiple severe impairments, namely bilateral degenerative joint disease of the shoulders, status-post surgeries, degenerative disc disease of the cervical spine, affective mood disorder, and learning disorder. (R. at 14). However, Plaintiff's impairments did not meet any of the listed impairments in the Code of Federal Regulations and thus he was not legally disabled because he possessed the RFC necessary to perform medium work as defined in 20 C.F.R. § 404.1567(c), except that he can lift no more than ten pounds chest level or higher, he can carry no more than thirty five pounds occasionally, and he can carry no more than ten pounds frequently. He can climb ladders, ropes or scaffolds no more than occasionally, he can reach overhead no more than occasionally, and he call reach in any other direction no more than frequently. He must avoid concentrated exposure to vibration and temperature extremes. He is limited to performing simple, repetitive tasks on a sustained basis, and any work should involve no more than ordinary and routine changes in work setting or duties. (R. at 16-23). The ALJ found Plaintiff is unable to perform any relevant past work.

The ALJ discussed the requirements of Listings 1.02 and 1.04 in regard to Plaintiff's should impairments and spinal impairments. (R. at 15). He also discussed Listings 12.02 and 12.04 in regard to Plaintiff's mental impairments. (R. at 15). The ALJ discussed much of the evidence in the record but he did not mention the finding of Dr. Rohs. Also, the ALJ only gave partial credence to the subjective statements of

the Plaintiff concerning his pain and symptomology in light of the objective medical evidence and the findings and conclusions of several of the medical sources. (R. at 17, 22).

LEGAL STANDARDS

## I.   *Standard of Review*

The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g). "The standard of review that governs decisions in disability-benefit cases is deferential." *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). When a claimant seeks judicial review of an ALJ's decision to deny benefits, this Court must only "determine whether [the ALJ's decision] was supported by substantial evidence or is the result of an error of law." *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). "The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence, 'although more than a mere scintilla of proof, is no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001) (citations omitted).

To determine whether the ALJ's decision is supported by substantial evidence, this Court will review the entire administrative record, but will not "reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). While this Court must ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to [her] conclusion," she need not

13

address every piece of evidence. *Clifford*, 227 F.3d at 872. The Court will remand the case only where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## II.   *Disability Standard*

To qualify for disability insurance benefits under the Social Security Act, claimants must prove that they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 416(i)(1). Additionally, the impairment must be of a sort "which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 416(i)(1). With respect to a claim for a period of disability and disability insurance benefits, claimants must also show that their earnings record has acquired sufficient quarters of coverage to accrue disability insurance benefits and that their disability began on or before the date that insurance coverage ended. 42 U.S.C. §§ 416(i)(3), 423(c)(1)(B).

The Commissioner engages in a factual determination to assess claimants' abilities to engage in substantial gainful activity. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980). To do this, the Commissioner uses a five-step sequential analysis to determine whether claimants are entitled to benefits by virtue of being disabled. 20 C.F.R. § 404.1520(a)(1); *Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made as to whether the claimant is presently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in such activity, the Commissioner then considers the medical severity of the claimant's impairments. *Id.* § 404.1520(a)(4)(ii). If the impairments meet the twelve-month duration requirement, the Commissioner next compares the claimant's impairments to a list of impairments contained in Appendix 1 of Subpart P of Part 404 of the Code of Federal Regulations and deems the claimant disabled if the impairment matches the list. *Id.* § 404.1520(a)(4)(iii). If the claimant's impairments do not match the list, then the Commissioner considers the claimant's Residual Functional Capacity ("RFC")[3] and past relevant work. *Id.* § 404.1520(a)(4)(iv). If claimants are still able to perform their past relevant work, then they are not disabled and the inquiry ends. *Id.* If they are unable to perform their past relevant work, then the Commissioner considers the claimants' RFC, age, education, and work experience to see if they can transition to other work. *Id.* § 404.1520(a)(4)(v). If a transition is not possible, then the claimant is deemed disabled. *Id.*

The plaintiff has the burden of production and persuasion on the first four steps of the Commissioner's analysis. *McNeil*, 614 F.2d at 145. However, once the plaintiff shows an inability to perform any past relevant work, the burden shifts to the Commissioner to show an ability to engage in some other type of substantial

---

[3] Residual Functional Capacity is defined as "the most [claimants] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1).

gainful employment. *Id.* (citing *Smith v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 857, 861 (7th Cir. 1978)).

DISCUSSION

In his memorandum in support of his motion for summary judgment, Plaintiff complains that the ALJ committed several errors in reaching his conclusion that Plaintiff was not disabled within the meaning of the applicable social security regulations. Plaintiff underlined his points of error in the brief. So the Court will address each underlined point.

**I.     "The ALJ erred in determining Mr. Murphy's joint impairments were not severe."**

As an initial matter, the ALJ did not find that Murphy's joint impairments were not severe; the ALJ clearly found that Murphy's bilateral degenerative joint disease of the shoulders was a severe impairment. (R. at 14). Yet, the ALJ concluded this impairment did not equal one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1.

As the Plaintiff is aware, to meet or equal a listed impairment, <u>all</u> the criteria identified in the listing must be met. 20 C.F.R. § 404.1525(d). The ALJ considered Listing 1.02, which requires a showing that the claimant has a major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint with the involvement of one major peripheral weight-bearing joint resulting in inability to ambulate

16

effectively or involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively. (R. at 14).

The Plaintiff contends the ALJ erred in his review of whether Plaintiff was able to perform fine and gross movements effectively because he did not consider whether Plaintiff could sustain such motions. (Doc. 12 at 4). The record shows that the ALJ clearly considered the observations of Dr. Yalamanchili, who performed a consultative physical examination of Plaintiff, and who personally observed Plaintiff to have normal ability to perform fine and gross manipulation of his extremities, and further noted he did not require an assistive device to ambulate (R. at 19, 292-94). Plaintiff points to no evidence in the record that he could not otherwise <u>sustain</u> such movements in light of Dr. Yalamanchili's findings, despite that the burden of proof at this stage of the analysis is on him. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner.").

The listing instructs that "[t]o use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, <u>examples of inability to perform fine and gross movements effectively include</u>, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and

17

handle papers or files, and the inability to place files in a file cabinet at or above waist level." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

There is no evidence in the record that Plaintiff was unable to carry out the activities of daily living mentioned above, or other similar activities. In Plaintiff's mental functional capacity assessment, it was reported that the Plaintiff was managing some daily chores within his physical tolerances, including simple meal preparation, laundry and dusting, driving for short distances, and shopping for clothing and his children. (R. at 15, 328). This evidence supports the ALJ's finding that the Listing 1.02 criteria were not met.

Plaintiff also contends that the ALJ failed to consider Plaintiff's pain. (Doc. 12 at 5). He cites the observations of Dr. Henry Rohs, the agency medical consultant who performed the Physical Residual Functional Capacity Assessment, that Plaintiff claims to suffer from chronic pain in his shoulders and his day-to-day activities as evidence the ALJ missed. (R. at 328). Although the ALJ did not specifically mention Dr. Rohs or his observations/findings, he did state in the opinion

> The claimant had his consultative physical examination (Physical CE) on November 7,2011 and complained of bilateral shoulder pain and limitation and neck pain. (Ex. 3 F). The doctor noted that there was some, but not a lot of loss of flexion, extension and abduction in both shoulders, with slightly more on the right than left. (Ex. 3F, p. 4). It was also reported that the claimant had normal strength (5/5) in the upper extremities, that muscular atrophy absent, and that he had normal ability to perform tine and gross manipulation. The doctor concluded that the claimant's symptomatology consisted of right shoulder pain more than left shoulder, inability to lift heavy weights, and diagnosed bilateral shoulder pain. The foregoing examination results were consistent with the objective medical and other evidence

> in the record, the undersigned finds that it is persuasive, and the Physical CE is given significant weight.

(R. at 19). An ALJ need not address every piece of evidence in the record; all the reviewing court must do is ensure that the ALJ "build[s] an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The foregoing passage demonstrates that the ALJ considered relevant information on the effect of Plaintiff's impairments on his ability to function.

Moreover, Dr. Rohs' assessment does not undermine Dr. Yalamanchili's. It should be noted that Dr. Rohs observed that the Plaintiff was able to care for himself, do routine household chores and that his "ADLS are partially credible based on the objective medical in file". (R. at 309). Dr. Rohs further found that Plaintiff could perform a restricted range of medium work, finding that he could occasionally lift/carry fifty pounds and frequently lift/carry twenty-five pounds; stand/walk and sit about six hours in an eight hour workday; push/pull to an unlimited degree; occasionally climb ladders, ropes and scaffolds; had limited reaching in all directions (including overhead); and had no other restrictions. (R. at 19, 305-08).

In light of the information considered in the opinion as well as the fact that the information provided by Dr. Rohs does not undermine the other evidence specifically mentioned in the ALJ's decision, this Court finds that the ALJ did not commit reversible error in failing to specifically mention Dr. Rohs' observations in his opinion.

II.  **"The ALJ found that the claimant was capable of returning to work as of the November 24, 2008 examination (Ex. 11F, p. 4)"**

Plaintiff contends the ALJ's finding that he could return to work following his examination by Dr. Newcomer in November 24, 2008 was erroneous. In making that finding, the ALJ explained he was relying upon Dr. Newcomer's own notes that Plaintiff had excellent forward flexion abduction, a functional arc of motion, and functional right shoulder. (R. at 19). Plaintiff points out that Dr. Newcomer also noted that Plaintiff probably was not going to get all of his rotation in his right arm back; still had a component of adhesive capsulitis (frozen shoulder); and that his left shoulder has an intra-articular derangement that would be benefitted by arthroscopic management.

None of what the Plaintiff points to speaks to his functionality though. Not getting rotation all the way back; still suffering some frozen shoulder; experiencing some pain from an intra-articular derangement—none of these statements shed light on to what extent Plaintiff could or could not make use of his shoulders and work at that time. In contradistinction, stating the observation that the Plaintiff had "excellent forward flexion abduction, a functional arc of motion, and functional right shoulder" supports the conclusion that Plaintiff was able to move his shoulder and use it in his daily activities, such as work.

Plaintiff hints that the need for the surgery in and of itself establishes he could not work. That cannot be right because people undergo surgery for any number of reasons, not solely to restore their body to a condition sufficient to work. Moreover, a review of the office treatment notes (Exhibit 11F) does not provide a

basis to conclude Dr. Newcomer was contemplating Plaintiff could not perform any work, but rather that he could not return to his then recent work as an electrician prior to November 2008. (*See* R. at 354, September 8, 2008 treatment note ("He is not ready at this point to return to the type of labor that he was doing before and the heavy lifting.")).

In short, the ALJ's decision that Plaintiff could return to some work was supported by substantial evidence and not clearly erroneous.

## III.   "ALJ errs in reviewing the 'B' Criteria to find him not disabled."

Next, Plaintiff complains that the ALJ's findings that he was not disabled under "B" criteria were clearly erroneous. The Court is confused as to what point Plaintiff is trying to make under this header. The Commissioner seems to think Plaintiff is complaining about the ALJ's assessment of his mental disability here. Indeed, in his brief, Plaintiff cites to page fifteen of the ALJ's decision as improperly considering "'B' criteria". (Doc. 12 at 4). Indeed, the only "B criteria" discussed on page fifteen of the decision is "paragraph B criteria" (R. at 15) and such discussion was clearly in relation to Plaintiff's claimed mental disability. Plaintiff does not explain how his physical limitations affect the extent to which his daily activities are affected by his mental limitations.

The ALJ discussed Listings 12.02 and 12.04. (R. at 15) Both listings require the level of severity for these mental disorders to be met only when the requirements in both paragraphs A and B are satisfied, or when the requirements in C are satisfied. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Paragraphs B of these

listings require that the claimant's mental disorder result in at least two of the following:

> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration;

20 C.F.R. § Pt. 404, Subpt. P, App. 1. Listing 12.00C provides that the term "marked" means "more than moderate but less than extreme."

Plaintiff claims the "ALJ's B Criteria findings are not supported by substantial evidence." (Doc. 12 at 6). "Substantial evidence, 'although more than a mere scintilla of proof, is no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Kepple*, 268 F.3d at 516. Here, the ALJ considered the psychological assessment performed by Dr. Alvin House, in which he observed Plaintiff was appropriately dressed in casual clothing, adequately groomed and was cooperative and compliant. (R. at 299). Plaintiff was alert and fully oriented, gave no indication of confusion, looseness of associations, or psychotic thought content. The ALJ also considered the Plaintiff managed some daily chores within his physical tolerances, including simple meal preparation, laundry and dusting, driving for short distances, shopping for clothing and his children, and managing finances. The ALJ discussed the observations that Plaintiff maintained contact with his family and others, ate out with friends or family, attended church and his children's sport activities. The ALJ noted that the Plaintiff had not experienced any episodes of decompensation of extended duration. The

Court is satisfied that the ALJ's decision that Plaintiff was not suffering from extreme or marked difficulties associated with his mental disorders was supported by substantial evidence.

Plaintiff takes issue with the ALJ's failure to discuss the following difficulties while assessing whether the "B criteria" were satisfied: hand numbness, naps on bad days, difficulty attending his children's events where his arm hangs, dropping and retrieving kids from school, dropping items, walking a mile and needing a ten minute break, and his shoulder pain and immobility. Yet, Plaintiff provides no explanation of how these things affected his mental functioning. He does not even make a perfunctory claim that these physical limitations caused his ongoing depression. (*See* Doc. 12 at 6-7). It should also be noted that the ALJ's treatment of the "B" criteria is supported by Dr. Larry Kravitz's own assessment, in which he declined to find any marked functional limitations on Plaintiff. (*See* R. at 322).

In short, Plaintiff has not provided any reason to conclude the ALJ's finding that Plaintiff did not meet the criteria of Listing 12.02 and 12.04 was not supported by substantial evidence.

## IV. "Mr. Murphy had two functional capacity evaluations that are consistent with disability."

Plaintiff underwent a functional capacity evaluation on January 19, 2010 for the purpose of determining his then-present abilities and limitations. (R. at 431). He later underwent another functional capacity evaluation in April, 2010 to assess his then-current level of function compared to his pre-injury position. (R. at 414). Plaintiff does not seems to be arguing that the ALJ ignored these pieces of evidence,

but rather that the ALJ was wrong to not take these pieces of evidence as supporting the conclusion that Plaintiff could not perform any work. The latter evaluation clearly concluded that Plaintiff was found to be functioning at the light-medium to medium level of physical capacity. (R. at 414). The first evaluation concluded that it was the opinion of the evaluator, within a reasonable degree of medical certainty, that Plaintiff could function on a full-time basis:

> 1. Material Handling: No more than Floor to Waist 30# Occasional, 45# Frequent and 22.5# Constant. Waist to [Shoulders], 15# Occasional, 15# Frequent and 7.5# Constant. [Shoulders] to Overhead 13# Occasional, 10# Frequent, 5# Constant. Pushing 53# Occasional, 26.5# Frequent. Pulling 66.8# Occasional, 33.4# Frequent.
> 2. Non-Material Handling: No more than Occasional reaching, grip/fine motor, kneel/crawling, frequent climbing.

(R. at 432).

These evaluations are not consistent with total disability or the inability to perform no work, as the Plaintiff suggests. Instead, they show that while the Plaintiff was very limited in the work he was able to perform, there is no indication he could not perform any limited work, and the ALJ concluded as much. The ALJ specifically found:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except that he can lift no more than ten pounds chest level or higher, he can carry no more than 35 pounds occasionally, and he can carry no more than ten pounds frequently. He can climb ladders, ropes or scaffolds no more than occasionally, he can reach overhead no more than occasionally, and he call reach ill any other direction no more than frequently. He must avoid concentrated exposure to vibration and temperature extremes. He is limited to performing simple, repetitive tasks on a sustained basis, and any work should involve no more than ordinary and routine changes in work setting or duties.

24

(R. at 16). There is nothing inconsistent with the ALJ's findings and the conclusions of the functional capacity evaluations. Thus, the Plaintiff's contention that the ALJ's findings were not supported by the evidence is unfounded.

## V. "ALJ improperly disregarded the information from the treating physicians."

Dr. John Purnell was Plaintiff's regular doctor. Plaintiff saw him in August and November of 2010. Dr. Purnell noted that Plaintiff could not do any work. (R. at 43). In the first place, it is not clear that this was Dr. Purnell's opinion, rather than a mere recordation of what the Plaintiff was communicating to him. Second, an ALJ is not required to give controlling weight to the ultimate conclusion of whether a claimant can work anyway because that is a finding specifically reserved for the Commissioner. 20 C.F.R. § 404.1527(e)(1); *Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010). Third, assuming Dr. Purnell's statement is an opinion, an ALJ may reasonably reject a treating physician's opinion when it is unsupported by the objective medical evidence. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). It has already been discussed how the evidence before the ALJ supported his finding that Plaintiff could perform light to medium work.

Next, Plaintiff complains that the ALJ disregarded that Plaintiff was given a score of forty-eight on a Global Assessment of Functioning ("GAF") test by Dr. Alvin House and that Dr. House noted that Plaintiff had a Major Depressive Disorder, Single Episode, Moderate with antidepressant medication. (Doc. 12 at 9).

The ALJ clearly considered this information on page ten of his decision. (R. at 21). He wrote:

Based upon the foregoing, the examiner assigned him a GAF of 48 (serious symptoms in functioning – almost non-functioning), which could indicate that the individual might be unable to work. (Ex. 4F, p. 3). This conclusion is inconsistent with the claimant's performance on the mental functioning examination, which was normal in almost every facet. The examiner based the very low GAF score on the claimant's subjective responses to the BDI, and on his subjective report of symptoms. Then, after intimating that the claimant could not function, the examiner contradicted that impression by stating that the claimant was competent to manage any benefit assigned him.

The objective medical evidence shows that the claimant had no history of psychiatric or other professional mental health treatment of any kind; the claimant treated with his primary care physician for his depression. Even though the undersigned has given the claimant the benefit of the doubt and has found that his depression and learning disorder are severe impairments, the foregoing mental examination is not enough to support a GAF of 48, nor is it enough to support a finding of disability. Thus, the undersigned gives no weight to the foregoing GAF.

(R. at 21).

Again, an ALJ may reasonably reject a treating physician's opinion when it is unsupported by the objective medical evidence. *See Skarbek*, 390 F.3d at 503. Putting aside the fact that Dr. House was not an actual treating physician in that Plaintiff was not his patient, the ALJ provided a plausible basis, supported by his discussion of the objective evidence before him, as to why he rejected the low GAF assessment. He focused on the fact that Plaintiff had no history of psychiatric or other professional mental health treatment of any kind. He also noted that the GAF conclusion was inconsistent with the Plaintiff's performance on the mental functioning examination, which was normal in almost every facet. He also mentioned that Plaintiff completed a Beck Depression Inventory ("BDI) and scored a twenty-four, which places him in the moderate range for depression.

26

Moreover, the GAF score of forty-eight is at odds with the daily activities Plaintiff himself said he undertakes. According to the GAF, a score of forty-eight correlates to such serious symptoms such as suicidal ideation, severe obsessional rituals, frequent shoplifting or any serious impairment in social, occupational, or school functioning such as not having any friends, and being unable to keep a job. Diagnostic and Statistical Manual of Mental Disorders, (DSM–IV–TR) (4th ed., Text Revision), p. 34. Plaintiff was able to maintain social relationships, attend church, eat out with friends and attend his children's activities. He has not presented any evidence he experienced anything like suicidal ideations, obsessional rituals or similar behavior. So the ALJ was totally justified in rejecting Plaintiff's low GAF score as proof of disability. It should be noted that the GAF table has been dropped from the most recent Diagnostic and Statistical Manual of Mental Disorders and as explained in *Pontarelli v. Colvin*, No. 13 C 1015, 2014 WL 3056616 (N.D. Ill. Jul. 7, 2014), were inherently unreliable as an indicator of functionality anyway.

Next, Plaintiff contends the ALJ omitted findings of Dr. Larry Kravitz that Plaintiff had a learning disability, was moderately limited in the ability to carry out detailed instructions and the ability to maintain attention and concentration for extended periods, and would be moderately limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. The ALJ did not omit Dr. Kravitz's findings. He acknowledged that the Plaintiff was rated moderately limited in his ability to carry

out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workweek and respond appropriately to changes in the work setting, but he also considered that the Plaintiff was found able to understand, remember and carry out simple and some detailed instructions, capable of managing customary workplace interactions and ordinary levels of work stress with limited changes in the day-to-day work routine, and therefore capable of routine and repetitive work. (R. at 82). Plaintiff does not explain how the ALJ was wrong to conclude as he did in the decision that, "because of his mental impairments, he is limited to performing simple, repetitive tasks on a sustained basis, which work should involve no more than ordinary and routine changes in work setting or duties." (R. at 23). That statement includes Dr. Kravitz's conclusion almost verbatim. (*See* R. at 328).

Next, Plaintiff simply lists the observations of Dr. Patel V. Mukesh that Plaintiff had acid reflux; a lump on the back of his left shoulder where he had a scar and a lesion removed; tingling in his hand in the wrist part and in his foot; hypertension, hyperlipemia(sic) and depression. There is absolutely no discussion of how these observations relate to the ALJ's decision, or render it incorrect or bereft of evidentiary support. Thus, the Court deems argument concerning Dr. Mukesh's observations waived because perfunctory and undeveloped arguments are waived on appeal. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991), applied to social security disability appeal by *Moss v. Astrue*, No. 09-1196, 2010 WL 2572040, at *5 (C.D. Ill. June 22, 2010).

Plaintiff continues throughout this "section" of his brief listing observations of Dr. Newcomer, additional notations and observations from Dr. Mukesh, and observations from Plaintiff's physical therapist, Jeff Schade[4] to support the following contentions:

> All we want from an ALJ is to agree with the physician and physical therapist that he still has shoulder pain that is affecting his functioning. It makes no sense for an ALJ to dismiss all medical opinion and give it no weight. That is why we have a Treating Physician's rule. It was an error of law not to consider it properly.

(Doc. 12 at 12-13). Nowhere in the ALJ's thirteen page opinion did he write that Plaintiff did not experience shoulder pain that affected his functioning. This audacious and unsupported claim undermines Plaintiff's arguments and does nothing to advance the merit of his case.

## VI.   "ALJ Erred in reviewing SSR 96-7p credibility of his inability to work due to pain."

In this section the Plaintiff repeats several of his arguments under a general theme that the ALJ erred in assessing Plaintiff's credibility in relation to the severity of the pain he was experiencing and his inability to work. Plaintiff begins with the assertion that he was laboring under a medically determinable impairment. (Doc. 12 at 13). The ALJ never found that he was not. Plaintiff misstates the record by contending the ALJ did not review the listing on joints because, as has already been discussed, the ALJ specifically discussed Listings 1.02 and 1.04 on page four of his decision. (R. at 15).

---

[4] The Court is unsure why the Plaintiff discusses the opinion of a physical therapist in the section of his brief dedicated to the opinions of treating physicians. Physical therapists are not physicians and are not "acceptable medical sources" as that term is defined under the regulations. 20 C.F.R. §§ 404.1502 and 404.1513(a).

Next, he contends that Plaintiff's daily activities do not necessarily translate to a finding that someone can work full time. Social Security Ruling 96-7p calls for an ALJ to consider the following criteria when assessing the credibility of a claimant's statements in addition to the objective medical evidence: 1) The individual's daily activities; 2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) Factors that precipitate and aggravate the symptoms; 4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Thus, consideration of daily activities is certainly something the ALJ should have considered. And he did. For example, he wrote:

> The claimant has bilateral degenerative joint disease of the shoulders status post surgeries, and degenerative disc disease of the cervical spine, however, the degree of symptoms and limitations alleged by the claimant due to pain are not consistent with the objective medical evidence regarding his alleged impairments, or his functional ability, including his testimony about his daily activities....

> the claimant managed some daily chores within his physical tolerances, including simple meal preparation, laundry and dusting, driving for short distances, shopping for clothing and his children,...

The claimant is a 46-year-old man who alleged he has been disabled since January 2008 because of his shoulder impairments with multiple surgeries, bone spurs in the neck, and depression. The claimant lives with his wife and two sons, ages 12 and 10. He drives several times a week. The claimant testified that his right shoulder bothers him the most, and it is aggravated by cold, vibration, and lifting things away from his body. He described difficulty sleeping due to pain. The claimant has Oxycodone for breakthrough pain and he estimated that he takes that medication about twice a month. He currently takes meloxicam daily. He described intermittent neck pain if he looks up or down too long. He thought his left shoulder was doing relatively well. The claimant takes Bupropion for depression and he testified that he is not as angry or irritable on that medication. The claimant testified that movement aggravates his shoulder pain, he reported that he has limited mobility to reach overhead, and he claims that his hand sometimes goes numb. He had previously reported decreased strength when attempting to hold something heavy. (Exhibit 9E) The claimant described some problems with concentration and focus that he attributes to a combination of pain and depression. The claimant attends his children's sporting events but reported that sitting can be hard if he cannot support his right arm. The claimant reported that he has good days and bad days; he uses ice and heat more on a bad day and he may nap due to poor sleep at night. The claimant also described headaches. . . .

(R. at 15, 17, and 22). The excerpts above confirm that the ALJ considered Plaintiff's daily activities, causes of pain, medicines, and more in his RFC assessment. Thus, this alleged point of error has no merit.

Plaintiff cites two cases[5]—*Hughes v. Astrue*, 705 F.3d 276 (7th Cir. 2013) and *Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013)—for the general proposition that an ALJ should not necessarily consider a claimant's ability to perform daily activities as evidence that the claimant can work, but neither of the cases support that proposition. Both cases instruct an ALJ to proceed with caution when considering

---

[5] Incidentally, the Court finds Plaintiff's consistent failure to pin cite to the actual pages of the opinions upon which he relies to be unprofessional and detrimental to the expeditious disposition of the motions *sub judice*.

how a claimant's daily activities impact a determination of whether the claimant can perform work, but it is ludicrous to suggest that an ALJ errs in treating a claimant's ability to perform daily activities as evidentiary support for a conclusion the claimant can work. The lessons from *Hughes* and *Roddy* are merely that the ALJ should try to understand the context surrounding the claimant's ability to perform daily activities when there is objective medical evidence of impairments.

Thus, in *Hughes* for example, the court explained that the claimant testified she was doing laundry because she could not afford to hire a laundress, so she had to do the laundry herself despite the pain. 705 F.3d at 279. She testified she had to buy groceries herself because she had no one else to do it for her and she did not wish to starve. *Id*. She took public transportation because it did not involve lifting heavy objects. *Id*. Plaintiff has not asserted that he took his children to and from school because there were no other options available. Plaintiff has not asserted that he does shopping because no one else could do it. Plaintiff has not asserted that he attends his children's events because he is forced to do so. There is no basis in the record to find that Plaintiff engaged in the activities of daily living he himself testified about for any other reason than he elected to undertake those activities. Even the January 1, 2013 letter from his wife supports that Plaintiff's engagement in activities is of his own choice, not necessity, like the claimant in *Hughes*. Thus, this Court cannot conclude the ALJ was incorrect in his analysis of Plaintiff's daily activities.

Next, Plaintiff simply lists several factors that precipitate and aggravate his symptoms: vibrations, cold weather, heavy lifting, jogging, walking, and standing up for too long. (Doc. 12 at 14). Since the Plaintiff does not state the significance of his listing these factors, the Court assumes the Plaintiff is arguing that the ALJ did not consider them. The ALJ did consider these factors in his opinion though. "[The Plaintiff] must avoid concentrated exposure to vibration and temperature extremes." (R. at 16). "The doctor concluded that the claimant's symptomatology consisted of right shoulder pain more than left shoulder, inability to lift heavy weights, and diagnosed bilateral shoulder pain. The foregoing examination results were consistent with the objective medical and other evidence in the record, the undersigned finds that it is persuasive, and the Physical CE is given significant weight." (R. at 19).

The Plaintiff lists evidence under the remaining criteria and concludes that the ALJ failed to consider the evidence of pain under "*Lopez*, 539". Earlier in the brief, Plaintiff cited to *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) in support of his general argument that an ALJ must conduct a critical review. Lopez explains that under SSR 96-7p, where there is medical evidence that supports the claimant's allegations, an ALJ may not simply ignore the claimant's allegations and must articulate specific reasons for his finding. 336 F.3d at 539-540.

The ALJ gave specific reasons for finding the Plaintiff not totally credible in articulating the severity and persistence of his symptoms. He mentioned that the Plaintiff told Dr. House he got injured at work in 2007. (R. at 22, 300). Yet, he told

Dr. Newcomer he injured himself in a car accident. (R. at 22, 357). Although the two explanations are not mutually exclusive, they do not seem to be consistent either and support a finding that Plaintiff is prone to give misinformation. Also, the ALJ took note that Plaintiff's own treating physician, Dr. Newcomer expressed his concern that Plaintiff was engaging in symptom magnification by performing more poorly on tests than his objectively determined limitations would suggest he should. (R. at 22, 351). These are not the words of the ALJ but the words of Dr. Newcomer. Moreover, Plaintiff's functional capacity assessment evaluators also expressed concerned about inconsistencies in his performance in the area of grip strength. (R. at 22, 421). The observations of Plaintiff's treating physician and evaluators that Plaintiff was engaging in symptom magnification and less than full effort support the ALJ's determination of that his subjective allegations were not fully credible.

## VII.   "ALJ omitted important considerations from his Residual Functional Capacity consideration."

Plaintiff leads off the last section of his brief by overstating the holding of *Herrman v. Colvin*, 772 F.3d 1110 (7th Cir. 2014). Plaintiff would have the Court believe the case holds that people with below normal grip strength with shoulder impairments cannot perform work that requires fingering and handling. While that may very well be true, that case makes no such sweeping pronouncements. In *Herrman*, the ALJ blatantly ignored the opinions of the claimant's treating physicians and the SSA's consultative physicians that she suffered from "fibromyalgia, spinal disk disease, 'photo-phobia' (abnormal sensitivity to light), . . . and that as a result she walks haltingly, has difficulty gripping objects, experiences

34

difficulty in rising from a sitting position, has trouble concentrating in a bright room or when looking at a computer screen, and as a result of this assemblage of impairments cannot do even light work on a full-time basis." 772 F.3d at 1111. Nowhere in the opinion did the court discuss the claimant's shoulders. Similarly, nowhere in the opinion did the court state that below normal grip strength forecloses all jobs that involve fingering and handling.

Plaintiff nevertheless alleges the ALJ did not consider his ability to handle objects and manipulate his fingers. It is somewhat ironic that Plaintiff places so much emphasis on *Herrman* given that the heart of the court's ruling there was that the ALJ erred in ignoring the opinions of the professionals. *Id*. Here, Plaintiff cannot escape the fact that his treating physician, Dr. Newcomer, the consultative physicians, and the functional evaluators, all concluded at one point or another that Plaintiff could perform light-to-medium work. (R. at 350 (Dr. Newcomer), at 414, 421 (functional capacity evaluators), at 349 (consultative physicians)). As to grip strength, in November of 2011, Dr. Sarat Yalamanchili examined Plaintiff and specifically found that his "[g]rip strength is strong (5/5) and equal bilaterally. Muscle strength is normal (5/5). Muscular atrophy absent. Ability to perform fine and gross manipulation is normal." (R. at 293). Given this evidence in the record, the Court is at a loss as to how Plaintiff can compare himself to the claimant in *Herrman*, where the opinions of the professionals were that she had below average grip strength and lacked the ability to grip objects. 772 F.3d at 1111.

Moreover, it is not as if the ALJ failed to consider Plaintiff's subjective statements as to the severity and cause of his symptoms and their effects on his functioning. The ALJ expressly included aversion to vibrations and extreme temperatures in his RFC assessment and that information came from the Plaintiff's subjective complaints of the triggers of his symptoms.

In conclusion, the ALJ's assessment of Plaintiff's RFC was adequate and is supported by substantial evidence in the record.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision denying disability benefits is affirmed. IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. 11) is DENIED, and Defendant's Motion for Summary Affirmance (Doc. 14) is GRANTED.

CASE TERMINATED.

Entered this 28th day of September, 2015.


_____
s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge